# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**STONEBRIDGE OPERATING CO., LLC,**
*et al.*,

         **Plaintiffs,**

                                     **Case No. 2:19-cv-1714**
      **v.**                                  **JUDGE EDMUND A. SARGUS, JR.**
                                       **Chief Magistrate Judge Elizabeth P. Deavers**

**ANTERO RESOURCES CORP.,**

         **Defendant.**

## OPINION AND ORDER

This case is before the Court on:

1.     Plaintiffs' Motion and Memorandum in Support of Judgment on the Pleadings on Defendant's Counterclaims (ECF Nos. 24, 25), Defendant's Memorandum in Opposition (ECF. No. 26), Plaintiffs' Reply (ECF. No. 29), and Defendant's Surreply (ECF No. 31-1), which was permitted to be filed by this Court, and

2.     Defendant's Motion and Memorandum in Support of Partial Judgment on the Pleadings, (ECF Nos. 27, 28), Plaintiffs' Response in Opposition (ECF. No. 30), and Defendant's Reply (ECF No. 33).

For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Judgment on the Pleadings (ECF No. 24) and **GRANTS** Defendant's Motion for Partial Judgment on the Pleadings (ECF. No. 27).

## I.

Stonebridge Operating Company, LLC, and Positron Energy Resources, Inc., (together "Stonebridge") and Antero Resources Corporation ("Antero") move for judgment on the pleadings and partial judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.

### A.    Federal Rule of Civil Procedure 12(c)

The standard under a Rule 12(c) motion for judgment on the pleadings is identical to the standard for a motion to dismiss under Rule 12(b)(6). *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008). To state a claim upon which relief may be granted, movants must satisfy the pleading requirements set forth in Rule 8(a). While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (clarifying the plausibility standard articulated in *Twombly*). "Although for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it][is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 677–79 (quoting *Twombly*, 550 U.S. at 55) (internal quotations omitted).

**B.      Matters Considered**

Because the Court herein considers motions under Rule 12 (c) of the Federal Rules of

Civil Procedure, the facts set forth below are taken from the pleadings, and from the exhibits

attached thereto, which are appropriately considered part of the pleadings.  *See Weiner v. Klais &*

*Co.*, 108 F.3d 86, 89 (6th Cir. 1997).  "[I]n ruling on a Rule 12 dispositive motion, a district

court 'may consider the Complaint and any exhibits attached thereto, public records, items

appearing in the record of the case and exhibits attached to [a party]'s motion to dismiss so long

as they are referred to in the Complaint and are central to the claims contained therein.'"  *Bassett*

*v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted).

## II.

Plaintiff Stonebridge and Defendant Antero agree that they negotiated and ultimately

signed a document drafted by Antero titled "Purchase and Sale Agreement" ("PSA"), which

consists of fourteen single-spaced pages containing numerous provisions set out in thirteen

Articles.  (Compl. ¶¶ 10, 14, ECF. No. 1; PSA at 1, ECF No. 1-1; Counterclaim ¶ 7, ECF No. 21,

PSA at 1, ECF No. 21-1.[1])  The Court will review (A) the relevant portions of the PSA,

italicizing for emphasis, and then (B) the parties' allegations in their pleadings.

**A.      The Purchase and Sale Agreement**

In the PSA, Plaintiff Stonebridge agreed to sell Defendant Antero oil and gas leases in

Monroe, Noble, and Guernsey Counties, Ohio.  Before the Articles are set forth, the PSA

identifies the parties to the contract and its execution date:

---

[1] The PSA is also attached as an Exhibit to Defendant's Answer/Counterclaim.  (ECF No. 21-1.)
For ease of reference, the Court shall throughout this decision cite to the PSA that is attached to
the Complaint.  (ECF No. 1-1.)

3

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this <u>"Agreement"</u>), *dated August 29, 2012* (the <u>"Execution Date"</u>), is by and between Stonebridge Operating, LLC, an Ohio limited liability company (<u>"Stonebridge"</u>), Positron Energy Resources, Inc., an Ohio corporation (<u>"Positron"</u>), and BT Energy Corporation, [addresses provided here] . . . . (collectively <u>"Seller"</u>), and Antero Resources Appalachian Corporation, a Delaware corporation, [address here] (<u>"Buyer"</u>). Seller and Buyer are sometimes individually referred to herein as a <u>"Party"</u>" or collectively as the <u>"Parties."</u>

(PSA at 1, ECF No. 1-1.)

The parties next establish through Recitals (1) the quantity of acres to which the PSA is directed, (2) the quality of the acreage, and (3) consideration.

## RECITALS

WHEREAS, Seller owns certain oil and gas leases located in Monroe, Noble, and Guernsey Counties, Ohio, *covering approximately 4,159 net mineral acres,* held by existing production from the shallow formations; and

WHEREAS, Seller desires to sell and Buyer desires to purchase all of Seller's interest in such oil and gas leases, <u>insofar and only insofar</u> as to all formations below the base of the Ohio Shale formation (top of the Java formation) at a depth of approximately 4195 feet, as seen in the W J Lydic Inc., Rosenberg #3 Well (API Number 3111122656000) located in Section II, Malaga Township, Monroe County, Ohio, upon the terms and conditions set forth in this Agreement.

NOW, WHEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

(PSA at 1.)

Article 1, "Purchase and Sale," contains provisions identifying the oil and gas leases to which the PSA is directed:

Buyer [Antero] agrees to purchase from Seller [Stonebridge] and Seller agrees to sell, assign and deliver to Buyer, effective as of the Closing Date, all of Seller's right, title. and interest in and to the following (the <u>"Assets"</u>):

(a) The oil and gas leases (including [specific] interests) *covering the lands depicted on <u>Exhibit A,</u> as more particularly identified on the lease schedule to be attached hereto within ten (10) business days as <u>Exhibit A-1</u>* (the <u>"Leases"</u>), . . . .

4

insofar and only insofar as to all formations below the base of the Ohio Shale formation (top of the Java formation) at a depth of approximately 4195 feet [defining "Deep Rights" and Shallow Rights"] . . . .

(f) . . .

The Parties shall work together to prepare a schedule of the Leases, which shall be attached hereto as Exhibit A-1, and a schedule of the Excluded Wellbores, which shall be attached hereto as Exhibit B, within ten (10) business days of the execution of this Agreement.

(PSA §§ 1.1(a), (f)).)  This provision in sum provides that the oil and gas leases to which the PSA is directed are depicted on Exhibit A that is attached to the PSA on the date of execution, August 29, 2012.  Those oil and gas leases were to be more particularly identified on Exhibit A-1, which the parties were to work together to prepare within ten days of August 29, 2012.

The parties also included in Article 1 of the PSA a sub-section providing an option for Defendant Antero "to add additional Leases" from the same counties that contained the 4,159 acres.  (PSA § 1.3).  That provision is titled "Option to Add Additional Leases" and provides:

Until the date that is six (6) months from the date of this Agreement, Buyer [*Antero*] *shall have the option, in Buyer's sole discretion,* to add additional Leases owned by Seller covering lands located in Noble, Monroe, and Guernsey Counties, Ohio, for $5,000 per net mineral acre and upon the terms and conditions of this Agreement.

If Buyer exercises such election, the additional Leases shall be added to Exhibit A-1 of this Agreement upon exercise thereof and shall become subject to the terms and conditions of the Agreement.

*Id*.

In Article 2, titled "Purchase Price," the parties established the total purchase price for the 4,159 acres at "$20,795,000.00 (the 'Purchase Price'), which is allocated among the Leases on the basis of $5,000 per 'Net Acre' (the 'Allocated Value')."  (PSA § 2.1.)  This amount was subject to outstanding title defects, allocated value effected by title defects, and allocated value effected by outstanding environmental defects. (PSA § 2.2.)

The PSA also contained the following Articles:  "Article 3 Buyer's Inspection," "Article 4 Title Matters," "Article 5 Environmental Matters," "Article 6 Seller's Representations and Warranties," "Article 7 Buyer's Representations and  Warranties," "Article 8 Covenants and Agreements," Article 9 Termination," "Article 10 Closing," "Article 11 Post-Closing Obligations," and "Article 12 Assumption and Retention of Obligations and Indemnification." The last Article, "Article 13 Miscellaneous," contains an integration clause and a forum selection clause.

**B.     The Parties' Allegations**

In its Complaint, Stonebridge alleges that it advised Defendant Antero "of additional acreage beyond the 4,159 acres" and that "Defendant Antero elected to include additional leases" on Exhibit A-1.  (Compl. ¶ 21, ECF No. 1.)  Plaintiff additionally alleges that it "timely submitted Exhibit A-1 to Antero," (September 17, 2012) and that the Exhibit "identified four categories of mineral acreage totaling approximately *26,474.21* acres of oil and gas interests," inclusive of the 4,159 specified in the PSA.  (*Id.* at ⁋ 22)

In its Answer and Counterclaims, Defendant Antero generally avers that the election of any additional leases above the 4,159 acres was at the sole option of Antero, the PSA unambiguously provides for the way to exercise the option, and Plaintiff has not made any allegation that Antero exercised the option as provided for in the PSA.  The PSA required Stonebridge to work with Antero to "more particularly identif[y] the leases" contained in Exhibit A, but while  "Stonebridge stated it would send Antero a 'draft' Exhibit A-1, [it] later sent over its draft of an Exhibit A-1. . . . [, which] [r]ather than more particularly identifying the 4,159 net mineral acres of leases that the parties contemplated including in the potential sale, Stonebridge unilaterally included – in what it acknowledged was its own draft Exhibit A-1 – what it now

contends was 26,474 acres of oil and gas lease rights." (*Id*. ¶ 13.)  Antero maintains that "[t]his 26,000 plus acres represented a more than six-fold increase over the total possible acreage position identified in the PSA signed just ten days earlier." (*Id*.)  And, the draft Exhibit A-1 included numerous duplicates and "different categories of alleged leases that Stonebridge only 'may' have owned and which Stonebridge even stated to be held by outside entities not even subject to the PSA." (*Id*.)

Antero further alleges that it "never agreed to be bound by the Stonebridge Draft Exhibit A-1 or to accept the Stonebridge Draft Exhibit A-1 as the final Exhibit A-1 to be attached to and incorporated into the PSA." (*Id*. ¶ 19.)  Antero retained the land brokerage firm "to assist Antero with a review of Stonebridge's holdings and to try to reach an agreed upon schedule of leases." (*Id*. at ¶ 20.)

The parties agree that on December 28, 2012, they closed on an assignment of Plaintiff Stonebridge's interest in 363.24 net acres for $1.816,200.00.  (Compl. ¶ 37, ECF No. 1; Counterclaim ¶ 22, ECF No. 21.)  The assignment documents state specifically that the sale was "made subject to the terms and condition of that certain Purchase and Sale Agreement dated August 29, 2012." (Settlement Stmnt. First Closing, ECF No. 29-1.)

What the ramifications of the events that occurred after this closing are a matter of dispute.

Defendant Antero attempted to renegotiate the PSA because, it alleges that in the same month the parties' closed on the 363.24 acres, December 2012, it became clear that the parties were working from two different versions of Exhibit A-1.  (Counterclaim ¶ 23, ECF No. 21.)  On February 5, 2013, Defendant Antero sent Stonebridge a proposed "Amendment to the Purchase and Sale Agreement dated August 29, 2012," which Stonebridge rejected.  (*Id*. at ¶ 26–27.)

Antero asserts that ultimately no agreement was reached over Exhibit A-1.  (*Id.* at ℙ 27).  On March 8, 2013, Antero "rescinded the proposal" to amend the PSA and on "March 19, 2013 Antero sent Plaintiff Stonebridge a letter confirming termination of the PSA."  (*Id.* at ℙ 28.)

Plaintiff, however, alleges that the December 2012 closing was the initial closing and should have included "at least 1,398 acres [that] had already been verified by Antero as of December 12, 2012 but the Defendant refused to close on any acreage other than the 363.24 acres which the parties closed on December 28, 2012."  (Compl. ¶ 38, ECF No. 1.)  Plaintiff further alleges that the "final closing was to be held on or before February 28, 2013 as to all remaining acreage not subject to any title dispute and/or to which any alleged title disputes may have been waived."  (*Id.* ¶ 41.)  In its final paragraph in the Complaint, Plaintiff avers that it was "willing and ready to conduct the second closing as required by the PSA and were prepared to present and execute assignment documents as they previously had done at the December 28, 2012 first closing and which they were required to provide under the terms of the PSA."  (*Id.* ¶ 51.)

Six years passed, and on May 1, 2019, Stonebridge filed its Complaint in this Court alleging that because Antero failed to close on the 26,474.21 acres Plaintiff included in its Exhibit A-1, Antero breached the PSA and it is "obligated to pay a minimum of $5,000 per mineral acre as listed on Exhibit A-1 for a total contract value of at least $131,381,050.00."  (*Id.* ¶ 58.)

Antero filed a Counterclaim asking for a declaratory judgment either invalidating the PSA in its entirety, or alternatively, limiting the PSA to the 4,159 net mineral acres identified in the PSA.  (Counterclaim, ECF No. 21.)

## III.

There is no dispute that the PSA establishes that the law of Ohio applies to the claims and counterclaims before this Court.  (PSA § 13.4, ECF No. 1-1.)  "In Ohio, an oil and gas lease is no different than any other contract."  *Shanesville Investments LLC v. Eclipse Resources I, LP*, 358 F. Supp. 3d 665, 669–70 (S.D. Ohio 2018) (citing *Phillips Exploration, Inc. v. Reitz*, 2012 WL 6594915, at *3 (S.D. Ohio, Dec. 18, 2012) ) (in Ohio, "[a]n oil and gas lease is a contract subject to traditional rules of interpretation and construction").

The interpretation of written contract terms "is a matter of law for initial determination by the court."  *Shanesville Investments LLC,* 358 F. Supp. 3d at 670 (citing *Phillips Exploration, Inc.*, 2012 WL 6594915, at *3 and *Absalom v. Hess Corp.*, 2014 WL 12746847, at *3 (S.D. Ohio Jan. 2, 2014)); *see also Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (applying Ohio law).  When confronting an issue of contract interpretation, the trial court must give effect to the intent of the parties.  *Shanesville Investments LLC,* 358 F. Supp. 3d at 670 (citing *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999)). The court presumes the intent of the parties will "reside in the language they choose to use in their agreement."  *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996).

When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.  *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St. 3d 397, 404 (2011).  If the plain language does not confer a "definite legal meaning," then the contract is ambiguous.  *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 219 (2003). In other words, "[a]mbiguity exists only when a provision at issue is susceptible to more than one reasonable interpretation."  *Lager v. Miller-Gonzalez*, 120 Ohio St.3d 47, 50 (2008) (citing *Hacker v. Dickman*, 75 Ohio St.3d 118, 119–120 (1996)).

The breach of contact claim brought by Plaintiff Stonebridge is based upon its allegations that Antero breached the PSA by failing to purchase "at least 1,398 acres [that] had already been verified by Antero as of December 12, 2012 but the Defendant refused to close on any acreage other than the 363.24 acres which the parties closed on December 28, 2012." (Compl. ¶ 38.) And, Plaintiff alleges that Antero also breached the PSA by failing to purchase the additional approximately 22,000 acres above the 4,159 that Plaintiff Stonebridge added to its Exhibit A-1. (*Id*.)

Defendant Antero moves for partial judgment, addressing only Plaintiff's second contention (*i.e.*, that Antero breached the PSA by failing to purchase the additional approximately 22,000-plus acres that Plaintiff Stonebridge added to its Exhibit A-1). Consequently, Defendant's motion "focuses solely on the fact that Stonebridge has failed to plead that Antero exercised its exclusive option to purchase an additional 22,000 acres from Stonebridge." (*Id*. at 6.)

Plaintiff Stonebridge moves for judgment on both counterclaims filed by Antero. That is, whether the PSA is a valid contract and whether it is limited to the 4,159 net mineral acres identified in the PSA.

The Court will, therefore, address (A) Plaintiff's motion related to whether the parties formed a contract when they executed the PSA and, (B) both parties' motions directed at the acreage above the specified 4,159 acres.

A.      **The PSA as an Enforceable Contract**

"A contract is generally defined as a promise, or a set of promises, actionable upon breach." *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3 (2002). A meeting of the minds, or mutual assent, as to the essential terms of the contract is a requirement to enforcing the contract. *Id*. at

3–4.(citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991) (stating that to "prove the existence of a contract, the plaintiff must show the elements of mutual assent (generally, offer and acceptance) and consideration."); *see also Adv. Sign Group, LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013) ("The concepts of 'mutual assent' and 'meeting of the minds' have been used interchangeably in Ohio case law.").

"Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3–4 (2002). "All agreements have some degree of indefiniteness and some degree of uncertainty. In spite of its defects, language renders a practical service. In spite of ignorance as to the language they speak and write, with resulting error and misunderstanding, people must be held to the promises they make." *Id.* at 4.

In the case *sub judice*, the parties dispute whether there was a meeting of the minds on the essential terms of the PSA. "Manifestation of mutual assent requires that each party make a promise or begin to render performance." *Adv. Sign Group, LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013) (citing *Precision Concepts Corp. v. Gen. Emp. & Triad Personnel Servs., Inc.,* No. 00AP–43, 2000 WL 1015114, at *2 (Ohio Ct. App. July 25, 2000) (citation omitted)). "The 'manifestation of assent may be made wholly or partly by written or spoken words, or by other acts or the failure to act.'" *Id.* (quoting *Precision Concepts Corp.,* 2000 WL 1015114, at *2). "Whether there has been a manifestation of mutual assent and/or a meeting of the minds is a question of fact to be determined from all the relevant facts and circumstances." *Id.* (citing *Matusoff & Assocs. v. Kuhlman,* No. 98AP–1405, 2000 WL 192449, at *3 (Ohio Ct. App. Sept. 28, 1999)).

11

Defendant Antero "seeks a declaration that the PSA is not enforceable because there was no *meeting of the minds* on the 'core product' of the PSA, namely, the oil and gas leases that were to be the subject of the PSA." (Def's Mem. in Opp. at 1, ECF No. 26.)  Plaintiff moves for judgment as a matter of law on this claim. (Pl's Mot. for Judgment on the Pleadings at 1, ECF No. 24.)  Defendant opposes Plaintiff's motion, arguing that (1) a "dispute as to the meeting of the minds must be resolved on summary judgment, not on the pleadings," and (2) Defendant "Antero's pleadings do not support a fact finding that there was a meeting of the minds." (Def's Mem. in Opp. at 10–11, ECF No. 26.)  Defendant's arguments are not well taken.

**1.      Resolution on the Pleadings**

Defendant Antero argues that this "Court cannot resolve the enforceability of the PSA at the pleading stage, because it would require the Court to resolve factual disputes and draw inferences in favor of Stonebridge on the critical question of mutual assent—both improper for a motion on the pleadings." (Def's Mem. in Opp. at 10, ECF No. 26) (citing, *inter alia*, *Advance Sign Grp., LLC*, 722 F.3d at 784)).  While it is true that the Court may not resolve factual disputes on motions directed at the pleadings, it does not follow that determination of whether there was a meeting of the minds is never appropriate for decision on the pleadings.

As this Court stated in the case upon which Defendant relies, mutual assent disputes are appropriate for resolution on motion in "clear cases" and it is appropriate for the fact finder to determine whether the parties intended to be bound when the case involves "complex facts and issues" as the case before it involved. *Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Care Holdings, Inc.*, 2:09-CV-781, 2010 WL 3069758, at *4 (S.D. Ohio Aug. 5, 2010); *see also Advance Sign Grp., LLC*, 722 F.3d 778, 784 (6th Cir. 2013) (addressing factual disputes in a case where there was no written contract).  In *Nephrology & Hypertension Specialists* this Court considered whether the parties intended portions of a Settlement Agreement to constitute a binding

contract while other portions of the Agreement were not a binding contract.  This Court indicated that while of course the parties "can so agree [to some portions being binding and others not], it is far from clear that they did so here."  The Court explained:

> The Settlement Agreement states that it "merely constitutes a statement of the mutual intentions of the parties with respect to the matters outlined herein . . . and creates no binding rights in favor of any party."  (Am. Compl. Ex. E.)

> This language suggests that the Settlement Agreement contains *no* binding provisions, but this interpretation is inconsistent with both Defendant's concession that certain terms are binding and the parties' actions in partially performing the contract. It is undisputed that the parties partially performed the contract: Fresenius paid NHS the sum of $500,000, the parties jointly developed and established the Delaware Clinic, and NHS has served as the Medical Director of that clinic.

*Nephrology & Hypertension Specialists,* 2010 WL 3069758, at *5.  This Court, therefore, concluded that the case was not one of "the clearest cases," that could be decided as a matter of law, instead that it presented "a question of fact whether the parties intended to be bound," to be determined by the factfinder.  *Nephrology & Hypertension Specialists* (citing *M.J. DiCorpo, Inc. v. Sweeney*, 69 Ohio St. 3d 497, 503 (1994) and *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.,* 541 F.2d 584, 588 (6th Cir.1976)).

Unlike the question presented in *Nephrology & Hypertension Specialists*, the undisputed facts presented in the case at bar show that there was a meeting of the minds as to the essential terms of the PSA as discussed in detail *infra*.

### 2. Antero's Pleading Related to PSA as a Contract

Defendant Antero argues that there was no mutual assent to the PSA and it is therefore not an enforceable contract.  As support for its position, Antero relies on an email from Stonebridge's principal in which he referred to the leases to which the PSA was directed as the PSA's "core product."  (Def's Mem. in Opp. at 1, ECF No. 26) (citing Pl's Brief in Support of Mot. for Judgment on the Pleadings, ECF No. 25, at Ex. 1).  From this statement, Defendant extrapolates as a fact that "Exhibit A-1 was the core document under the PSA" and without the

parties' agreement on the contents of Exhibit A-1 there was no meeting of the minds. *Id.* However, this statement finds no support in the PSA or the parties' actions.

That is, it is not disputed that the PSA has as its core product oil and gas leases. The plain language of the PSA indicates that these oil and gas leases are "depicted on Exhibit A" and "more particularly identified on the lease schedule to be attached hereto within ten (10) business days as Exhibit A-1." (PSA § 1.1(a).) Antero's insistence that Stonebridge's reference to the oil and gas leases as the "core product" means that "Exhibit A-1 is the core document" enjoys support from neither the PSA nor Antero's actions pursuant to the PSA. And, no reasonable inference can be made that these "core products" can only be found on "the core document" that is Exhibit A-1.

In this same vein, Defendant Antero argues that, "[t]he factual allegations in Antero's Counterclaim—which must be accepted as true for the purpose of this Motion—and the reasonable inferences derived therefrom actually ***support*** Antero's claim that there was no meeting of the minds." (Def's Mem. in Opp. at 7, ECF No. 26.) In other words, Defendant Antero assumes that as long as it alleges the legal conclusion that there was no meeting of the minds, Plaintiff's motion is automatically defeated. Defendant, however, is mistaken.

The relevant inquiry is not what Stonebridge refers to as a "core product" or what Antero pleads as its assessment of a legal conclusion, but whether the pleadings before the Court reflect a meeting of the minds. When there is a written contract, Ohio courts hold that "the signing of an agreement and acquiescence in its effect generally demonstrates the existence of a 'meeting of the minds.'" *NetJets, Inc. v. Binning,* 10th Dist. No. 04AP–1257, 2005–Ohio–3934, ¶ 8, citing *Episcopal Retirement Homes, Inc*, 61 Ohio St.3d 366, overruled on other grounds (citing *Cuyahoga Cty. Hosps. v. Price*, 64 Ohio App.3d 410 (1989). Antero acknowledges that it negotiated, drafted, and signed the PSA on August 29, 2012, referred to as the "Execution Date."

Pursuant to the PSA's unambiguous terms, to which Antero refers in its pleading, the PSA is a straightforward contract involving Antero's ("Buyer") purchase of oil and gas leases from the Plaintiffs, Stonebridge and Positron ("Seller").  The oil and gas leases are identified as leases located in Monroe, Noble, and Guernsey Counties, Ohio, covering approximately 4,159 net mineral acres, held by existing production from the shallow formations; and were depicted on Exhibit A, as more particularly identified on the lease schedule to be attached hereto within ten (10) business days as Exhibit A-1.  Thus, the acreage is identified on Exhibit A that was attached to the PSA at its execution.  It was, however, never more particularly identified in an agreed upon Exhibit A-1.

Antero asserts that because the parties were unable to more particularly identify those acres on Exhibit A-1 there was no mutual assent.  However, Antero's admission of its partial performance belies its contention.  Partial performance evidences an intent to be bound.  *See Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Care Holdings, Inc.*, No. 2:09-CV-781, 2010 WL 3069758, at *5 (S.D. Ohio Aug. 5, 2010).  Indeed, the Sixth Circuit interpreting Ohio law has been clear that manifestation of mutual assent requires that each party make a promise *or* begin to render performance.  *Adv. Sign Group, LLC*, 722 F.3d at 784.  Here, there is no dispute that each party made promises in the PSA *and* rendered performance pursuant to the promises made in the PSA.

Antero and Stonebridge both plead that they executed the transfer of over 324 acres for over $1.8 million.  The documents signed by Antero and Stonebridge recording this sale specifically state that the sale and purchase was made pursuant to the PSA. ("PURCHASE AND SALE AGREEMENT BETWEEN STONEBRIDGE OPERATING, LLC, POSITRON ENERGY RESOURCES, INC., AND BT ENERGY CORPORATION ("SELLER") AND

ANTERO RESOURCES APPALACHIAN CORPORATION ("BUYER") DATED AUGUST

29, 2012.")

Further, Antero attempted to renegotiate the PSA as it stated in the February 5, 2013

letter it sent to Plaintiffs, and refers to in its Counterclaim at ¶¶ 24–28:

> Due to inaccuracies in the lease schedule attached as Exhibit A-1 to the PSA, and corresponding issues delaying Antero's due diligence process, *Antero proposes to amend the PSA as follows:*
>
> 1. Lease Exhibit. The attached lease exhibit shall replace Exhibit A-1 to the PSA in its entirety. The parties acknowledge that with respect to those Leases with missing information denoted as "NA" in Exhibit A, Antero shall not be obligated to Close on such Leases unless the missing information, once obtained, including without limitation, the actual location of the lands covered by such Leases, is satisfactory to Antero, in its sole discretion.

Antero continues, again recognizing the PSA as a contractual obligation:

> *Except for the amendments set forth above, all other terms and provisions of the PSA shall remain in force and effect.* Capitalized terms not defined herein shall have the meaning set forth in the PSA.

(Pl's Brief in Support of Mot. for Judgment on the Pleadings, Ex. 4, ECF No. 25-4) (emphasis

added).

Moreover, the PSA is actionable upon breach in that the parties unequivocally established

a total value to the PSA – the purchase price for the Assets shall be $20,795,000 (the "Purchase

Price"), which is allocated among the Leases on the basis of $5,000 per "Net Acre" (the

"Allocated Value"), which is 4,159 net mineral acres. *See Kostelnik*, 96 Ohio St. 3d at 3.  The

parties also provided for specific termination provisions, as well as a forum selection clause in

the event of alleged breach.

Finally, the PSA explicitly states that it includes the entire agreement between the parties and

that it is binding:

13.5 **Entire Agreement**. This Agreement Constitutes the entire understanding among the parties, their respective partners, members, trustees, shareholders, officers, directors and employees with respect to the subject matter hereof, superseding all negotiations, prior discussions, and prior agreements and understandings relating to such subject matter.

13.6 **Binding Effect**. This agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto, and their respective successors and assigns.

Accordingly, in the instant action this Court need not resolve any factual disputes material to its determination of whether there was mutual assent to the creation of the PSA, which was indisputably negotiated and renegotiated, signed, and partially performed by two sophisticated parties. The PSA unambiguously identified the execution date (August 29, 2012) the parties (Antero and Stonebridge), the subject matter (oil and gas leases in particular Ohio counties), the number of acres (4,159), the total cost amount to be exchanged (4,159 acres at $5,000 per acre for a total of $20,795,000), and an option for Antero to add more acreage. Thus, the Court **GRANTS** Plaintiff's Motion for Judgment on the Pleadings on Antero's counterclaim asking for a declaration that the PSA is not a contract.

Whether Antero breached the PSA by failing to include the approximately 1,398 acres that had allegedly been verified by Antero as of December 12, 2012, whether Antero's termination of the PSA was effective, the impact of the parties' inability to reach agreement on Exhibit A-1, or any other breach of contract disputes appropriately before the Court related to the 4,159 acres is left open.

## B.    Acreage Above the Specified 4,159

Both parties ask for judgement as a matter of law on whether Antero breached the PSA by failing to purchase the approximately 22,000 acres identified on the Exhibit A-1 drafted by Plaintiff Stonebridge.

As Stonebridge recognizes in its Complaint, PSA § 1.3 is the operative provision in the PSA for adding leases beyond the approximately 4,159 net mineral acres. (Compl. ¶ 19) (alleging that the "PSA specifically identified 4,159 net mineral acres," and that "Section 1.1(a) of the PSA provided that the agreement covered 'Assets' as 'depicted on Exhibit A.'"). Stonebridge then set out PSA § 1.3, regarding Antero's option, in its "sole discretion," to "elect" to "add additional Leases . . . for $5,000 per net mineral acre" and that "[i]f [Antero] exercises such election, the additional Leases shall be added to Exhibit A-1 of [the PSA] upon exercise thereof and shall become subject to the terms and conditions of [the PSA]." (Compl. ¶ 20) (emphasis added).

In the next two paragraphs, Plaintiff alleges that it informed Antero in emails of the additional acreage and that Antero "elected" to include "additional leases" "beyond the 4,159 acres" that were included on Exhibit A-1, which when opened and reviewed identified in some way "mineral acreage totaling approximately 26,474.21 acres of oil and gas interests." (*Id*. ¶¶ 21, 22.) Thus, Stonebridge contends that under PSA § 1.3 the 22,000 plus acres were added to the PSA. Stonebridge further contends that, even if Antero did not exercise its option under § 1.3, Stonebridge had the right under the contract to add the acreage in Exhibit A-1 and Antero had to accept it unless it utilized the Title Defect provisions to opt out of the acreage.

Defendant Antero argues that Plaintiff has failed to state a claim upon which relief can be granted whether it stands on its Complaint and its allegations that (1) Antero *elected* to add the 22,000-plus acres pursuant to PSA § 1.3, or whether Stonebridge relies on the arguments made in its Memorandum in Opposition to Defendant's Motion that (2) "the PSA authorized ***Stonebridge*** to unilaterally add ***as many acres as it wanted*** by simply putting them in a unilaterally-prepared Exhibit A-1, and that Antero was then obligated to purchase ***all*** of those acres unless it sent 'Title Defect' notices." (Reply at 1–2, ECF No. 3) (emphasis in original). This Court agrees.

### 1.     Option to Purchase Additional Acreage Under PSA § 1.3

"Ohio courts have defined '[a]n option contract for the purchase of real property [as] an agreement wherein the legal titleholder of the property grants another person the privilege, *without the obligation,* to purchase the real property at a set price within a set time.'" *Am. Servicing Corp. v. Wannemacher*, 19 N.E.3d 566, 571 (Ohio App. 3d Dist. 2014) (citations omitted); *see also* Restatement (Second) of Contracts § 25.  The party having an option is not bound to exercise it.  *Aldahan v. Tansky Sales, Inc.*, 99AP-651, 2000 WL 780572, at *21–22 (Ohio Ct. App. June 20, 2000).  If the party holding the option chooses to exercise it, the party must accept the option in clear terms—"[i]t is not enough that the words of a reply justify a probable inference of assent."  Restatement (Second) Contracts § 57 at 142, cmt. b.

"Moreover, in an option contract, a party may exercise its option only in the manner provided in the contract."  *Aldahan v. Tansky Sales, Inc.*, 99AP-651, 2000 WL 780572, at *8 (Ohio App. 10th Dist. June 20, 2000) (citing *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 380 (1993) and *Midland Properties Co. v. Union Properties, Inc.* (N.D. Ohio 1957), 148 F. Supp. 150, 152 (N.D. Ohio 1957)).  "If the option designates the manner of acceptance and method of payment, the optionee must comply with the terms."  *Id*. (citing *Rossman & Co. v. Donaldson*, Franklin App. No. 94APE03-388, unreported (Dec. 6, 1994)).

Defendant Antero argues that, "[w]ithout pleading facts to support that Antero exercised this option to add acreage to the PSA, Stonebridge fails to plead the existence of a contract for anything more than 4,159 net mineral acres." [2]  *Id*. at 6.  Antero highlights that in

---

[2] Antero also argues that Stonebridge's claim fails because it does not allege the existence of a writing that satisfies the Statute of Frauds.  Because the Court agrees with Defendant's first argument related to pleading sufficiency, it need not address the Statute of Frauds issue.

the Complaint, Stonebridge only once references the method by which it belies that the 22,000-plus acres came to be included in the PSA:

> After being advised by Eddy Biehl [of Stonebridge] of additional acreage beyond the 4,159 acres Antero had identified through its own pre-meeting research, Defendant Antero elected to include additional leases and advised Eddy Biehl to include on Exhibit A-1 all of the Plaintiffs' lease acreage in Noble, Monroe, and Guernsey Counties, Ohio.

(Def's Brief in Support of its Mot. for Partial Judgment at 6, ECF No. 28) (citing Compl. ¶ 21.)

Defendant Antero points out that "Stonebridge rests a claim for over $100 million on one phrase: 'Defendant Antero *elected to include additional leases* . . .'" (*Id*. at 6) (citing Compl. at ¶ 21). Antero concludes that, "[t]his one statement, without any evidence [or even allegation] of how or when Antero 'elected' such acreage, amounts to a legal conclusion and should not be accepted as true for the purpose of a motion to dismiss." *Id*. (citing *Iqbal*, 556 U.S. at 686*); see also id.* ("Stonebridge's claim fails as a matter of law because Stonebridge's allegations are conclusory and lack any plausible factual support.").

Plaintiff Stonebridge responds that the statement is not conclusory, particularly when viewed in the context of the entire Complaint. Stonebridge asserts that "it was the intention of Antero to purchase more of what Stonebridge had within the geographic area specified." (Pl's Mem. in Opp. at 3, ECF No. 30.) Plaintiff supports this statement, and its allegation in the Complaint that "Defendant Antero elected to include the additional leases and advised [Plaintiff] to include them on Exhibit A-1," with an email that Stonebridge sent about its work on Exhibit A-1, which states in relevant part:

> We're [Stonebridge is] working to get a scrubbed list of leases for our Exhibit A. It appears we have a hook in something upwards of 14,000 acres when we include the deep rights held by our wells but possibly owned by others. We can talk about how this might work for you.

I'll get a list to [you] later today.  Thanks again & I'm looking forward to working with you and Antero.

(*Id.*, Ex. 1, ECF No. 30-1.)

Stonebridge also supports its position with another email it sent that same day to another Antero employee that states in relevant part:

We are working with a couple of the owners of the deep rights associated with a number of the wells we operate in Noble County. Through these efforts we may have additional acreage that we can add to the agreement & perhaps clean up as part of our effort to get our deep rights that in shape.

We're putting together a schedule of our leases and those of our predecessors in title for your review.

(*Id.*, Ex. 2, ECF No. 30-2.)

Plaintiff continues, stating that no one "at Antero said 'whoa, what are you talking about we're only dealing on 4,159 acres.'"  (*Id.* at 4.)   Plaintiff opines that there was no response like that from Defendant because "[t]he parties understood that Antero wanted as much as it could get on A-1 and the Complaint explains this in detail."  (*Id.*)  Stonebridge maintains that, after it sent these emails and submitted its Exhibit A-1, "Antero was bound to purchase all the acreage on A-1 [(26,474.21)] that was not defected out of the deal *and* that Antero elected to include all that acreage."  (*Id.* at 5) (citing Compl. at ¶¶ 20, 21, 43-51).

However, Plaintiff's arguments related to what it thinks was "the intention of Antero" (*i.e.*, to purchase more acres of what Stonebridge had within the geographic area specified) or what it believes the "parties understood" (*i.e.*, that Antero wanted as much as it could get on Exhibit A-1) are irrelevant to interpretation of the PSA.  The intent of the parties, to which this Court must give effect, resides in the language they chose to use in the PSA.  *Hamilton Ins. Serv., Inc.*, 86 Ohio St.3d at 273; *Graham*, 76 Ohio St.3d at 313.  With regard to election of any acreage above the 4,159, the language used in the PSA is unambiguous, susceptible to only one reasonable interpretation, and the Court must therefore simply apply it.  *Lager*, 120 Ohio St.3d 47, 50 (2008).

The PSA unequivocally provides for Antero to add acreage to Exhibit A-1 – not Stonebridge.  PSA § 1.3 provides for the addition of acreage at the "sole discretion" of Antero and that the election must be in writing.  Yet, at the bottom of Stonebridge's argument is that the acreage *Stonebridge added* became part of the PSA.  As discussed in more depth below, the PSA makes no provision for Stonebridge to unilaterally add acreage, but only to work with Antero to describe with more particularity the acreage Antero would purchase as to the original 4,159 acres.

Further, Plaintiff relies on the legal conclusion that Defendant exercised its option to add the additional 22,000-plus acres without pleading any clear or unambiguous actions by Antero.  Indeed, without pleading any actions at all by Antero, but rather inaction (failure to utilize the Title Defect provision or to respond to emails and indicate that the additional acreage added by Stonebridge was not accepted).  This is insufficient under Ohio law, which requires "accept[ion of] the option in clear terms" and "only in the manner provided in the contract."  Restatement (Second) Contracts § 57 at 142, cmt. b; *Aldahan*, 2000 WL 780572, at *8.  And, there is no dispute that Plaintiff failed to plead that the option was elected in the way in which the PSA requires – in writing by Antero.

Finally, because the Court concludes that Plaintiff Stonebridge was unable to elect to add acreage above the 4,159, Antero's failure to utilize the Title Defect provisions to opt out of any acreage added above the 4,159 is of no moment.

### 2. Addition of Acres by Stonebridge Pursuant to the PSA

Plaintiff makes the additional argument that the "PSA simply does not contain any language to support th[e] interpretation" that "any acre in the deal at all over the 4,159 had to be added by Antero exercising its § 1.3 option."  (Pl's Mem. in Opp. at 5, ECF No. 30.)  Plaintiff posits that the Recitals that indicate that the PSA was directed at 4,159 acres "[i]s not strictly part of the

contract, however, and cannot be construed as governing or constituting the parties' agreement."
(Pl's Mem. in Opp. at 8, ECF No. 30) (quoting *Fugate v. Town of Payson*, 164 Ariz. 209, 211, 791
P.2d 1092, 1094 (Ct. App. 1990)).  Plaintiff concludes that, "[t]herefore, the *Complaint* states a claim
regardless of whether or not Antero is deemed to have exercised its option under § 1.3 when A-1 was
incorporated into the PSA with more than 4,159 acres."  (*Id*.)

Antero responds that Stonebridge's position fails as a matter of unambiguous contract
construction.  This Court agrees.

The unambiguous terms of the PSA prohibit Plaintiff's interpretation, which "violates the
fundamental tenent of contract construction that all terms of a contract must be given effect in
accordance with the express intent of the parties."  *Padula v. Wagner*, 37 N.E.3d 799, 809 (Ohio
App. 9th Dist. 2015).  "In the construction of a contract courts should give effect, if possible, to every
provision therein contained, and if one construction of a doubtful condition written in a contract
would make that condition meaningless, and it is possible to give it another construction that would
give it meaning and purpose, then the latter construction must obtain."  *Id*. (citing *Bank One, N.A. v.
The Oaks of Medina*, CIV.A. 04CA0080-M, 2005 WL 1632527, at *3 (Ohio App. 9th Dist. July 13,
2005); *Farmers Natl. Bank v. Delaware Ins. Co*., 83 Ohio St. 309 (1911), paragraph six of the
syllabus; *Padula v. Wagner*, 37 N.E.3d 799, 809 (Ohio Ct. App. 2015) (noting the "fundamental
tenent of contract construction that all terms of a contract must be given effect in accordance with the
express intent of the parties").

The Court, therefore, should consider and give meaning to "every paragraph, clause, phrase,
and word" of the PSA, including all its terms, the Recitals, and the Exhibit A map attached to the
PSA.  *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994);
"Recitals in a contract should be reconciled with the operative clauses of the contract, and given
effect, to the extent possible." 17A C.J.S. *Contracts* § 403.  Indeed, *Fugate v. Town of Payson*, on
which Stonebridge relies, merely stands for the proposition that when recitals conflict with operative

clauses, the operative clauses should control.  791 P.2d 1092, 1094 (Ariz. Ct. App. 1990).  It does not

hold that a court may ignore recitals when interpreting a document, such as the PSA, where no

conflict exists between its terms.

Antero's interpretation related to any additional acreage above the 4,159 acres considers and

gives meaning to all terms and recitals in the PSA, which are all consistent with one another in

limiting the PSA to 4,159 net mineral acres absent an election.  Antero correctly points out that the

PSA was directed toward the sale of "approximately 4,159 net mineral acres," and that the "Seller

desires to sell and Buyer desires to purchase all of Seller's interest in such oil and gas leases. . ."

Antero continues:

> Stonebridge's proposed interpretation ignores and renders meaningless the
> PSA's express reference to 4,159 net mineral acres.
>
> Additionally, **Section 1.1**—the provision that defines the "Leases" for the
> potential acquisition—also limits the PSA's scope to 4,159 net mineral acres. Section
> 1.1 provides that Antero was purchasing only the leases covering those specific lands
> depicted on the Exhibit A map, which amounts to lands covering the contemplated
> 4,159 net mineral acres, if the parties could more particularly identify those leases
> through an agreed upon Exhibit A-1 lease schedule.

(Def's Reply at 4–5, ECF No. 33.)

Other PSA provisions reinforce the unambiguous language the parties used that reflects their

intent to limit the contract to 4,159 net mineral acres, including § 1.3 (providing for Antero's election

to add additional leases to Exhibit A-1) and § 2.1 (calculating the purchase price of $20,795,000

based on 4,159 net mineral acres).

The Court, therefore, concludes that a plain reading of the PSA confirms that without a clear

election by Antero under PSA § 1.3, the PSA is limited to 4,159 net mineral acres of Leases referred

to in the PSA and depicted on Exhibit A.

The Court notes, however, that even if the PSA provided for Stonebridge to add acreage,

Stonebridge's own words are equivocal about what its Exhibit A-1 included and, whether it offered

its "draft of Exhibit A-1" to be incorporated into the PSA as it was drafted by Stonebridge.  That is,

in the emails upon which Stonebridge relies, Stonebridge itself refers to its Exhibit A-1 as a *draft*, and that Stonebridge *may* have acreage that was "possibly owned by others" that the parties could "talk about," but that until then Stonebridge would continue to "better organize" the Exhibit lists which currently "likely" contains "a number of duplicates."  (Pl's Brief in Support of Mot. for Judgment on the Pleadings, Exs. 1, 2, 3, 4, ECF Nos. 25-1, 25-2, 25-3, 25-4.)

Thus, Stonebridge does not plead that it elected to include acreage above the 4,159 or that it requested that its draft A-1 was intended to be the final draft included in the PSA.  Its allegations supported by the emails reflect explanations that Stonebridge was working on a draft Exhibit A-1 with numerous duplicates and potentially more acreage that it could obtain that may be owned by others.  Thus, even if the PSA provided for Stonebridge to expand the scope of the PSA, which it does not, Antero could not have known from these emails that Stonebridge meant to include 26,000-plus acres on the final Exhibit A-1.

Based on the foregoing, the Court finds that Plaintiff has failed to set out a plausible claim for the additional 22,000-plus acres under the clear and unambiguous language of the PSA. The Court, therefore, **GRANTS** Defendants' Motion for Partial Judgement and **DENIES** the portion of Plaintiff's Motion for Judgment on the Pleadings directed to the acreage above the 4,159 acres specified in the PSA.

## IV.

For the reasons set forth above, Stonebridge's Motion for Judgment on the Pleadings (ECF No. 24) is **GRANTED IN PART AND DENIED IN PART**, and Antero's Motion for Partial Judgment on the Pleadings (ECF No. 27) is **GRANTED**.

**IT IS SO ORDERED.**

**12/30/2020**                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                          **EDMUND A. SARGUS, JR.**
                                                  **UNITED STATES DISTRICT JUDGE**