UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STONEBRIDGE OPERATING CO., LLC,
*et al.*,

        Plaintiffs,

          v.

ANTERO RESOURCES CORP.,

        Defendant.

**Case No. 2:19-cv-1714**
**JUDGE EDMUND A. SARGUS, JR.**
**Chief Magistrate Judge Elizabeth P. Deavers**

## OPINION AND ORDER

This matter is before the Court on the parties' cross motions for summary judgment.  For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion (ECF No. 67) and **DENIES** Plaintiff's Motion (ECF No. 51).

## I.

This case involves an oil and gas contract dispute between two sophisticated parties.

### A.    The Purchase and Sale Agreement

Stonebridge Operating Co. and Positron Energy Resources, Inc.'s (together "Stonebridge") and Defendant Antero Resources, Corp. ("Antero") agree that they negotiated and ultimately signed a document drafted by Antero titled "Purchase and Sale Agreement" ("PSA"), which consists of fourteen single-spaced pages containing numerous provisions set out in thirteen Articles.  (Compl. ¶¶ 10, 14, ECF. No. 1; PSA at 1, ECF No. 1-1.)  The Court will review the relevant portions of the PSA, italicizing for emphasis.  In the PSA, Stonebridge agreed to sell Antero deep geologic formations in oil and gas leases, held by existing production from shallow formations, in Monroe, Noble, and Guernsey Counties, Ohio.  Before the Articles are set forth, the PSA identifies the parties to the contract and its execution date:

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement"), *dated August 29, 2012* (the "Execution Date"), is by and between Stonebridge Operating, LLC, an Ohio limited liability company ("Stonebridge"), Positron Energy Resources, Inc., an Ohio corporation ("Positron"), and BT Energy Corporation, [addresses provided here] . . . . (collectively "Seller"), and Antero Resources Appalachian Corporation, a Delaware corporation, [address here] ("Buyer"). Seller and Buyer are sometimes individually referred to herein as a "Party'" or collectively as the "Parties."

(PSA at 1, ECF No. 1-1.)

The parties next establish through Recitals (1) the quantity of acres to which the PSA is

directed, (2) the quality of the acreage, and (3) consideration.

## RECITALS

WHEREAS, Seller owns certain oil and gas leases located in Monroe, Noble, and Guernsey Counties, Ohio, *covering approximately 4,159 net mineral acres,* held by existing production from the shallow formations; and

WHEREAS, Seller desires to sell and Buyer desires to purchase all of Seller's interest in such oil and gas leases, insofar and only insofar as to all formations below the base of the Ohio Shale formation (top of the Java formation) at a depth of approximately 4195 feet, as seen in the W J Lydic Inc., Rosenberg #3 Well (API Number 3111122656000) located in Section II, Malaga Township, Monroe County, Ohio, upon the terms and conditions set forth in this Agreement.

NOW, WHEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

(PSA at 1.)

Article 1, "Purchase and Sale," contains provisions identifying the oil and gas leases to

which the PSA is directed:

Buyer [Defendant Antero] agrees to purchase from Seller [Plaintiff Stonebridge] and Seller agrees to sell, assign and deliver to Buyer, effective as of the Closing Date, all of Seller's right, title. and interest in and to the following (the "Assets"):

(a) The oil and gas leases (including [specific] interests) *covering the lands depicted on Exhibit A, as more particularly identified on the lease schedule to be attached hereto within ten (10) business days as Exhibit A-1* (the "Leases"), . . . . insofar and only insofar as to all formations below the base of the Ohio Shale

2

formation (top of the Java formation) at a depth of approximately 4195 feet [defining "Deep Rights" and Shallow Rights"] . . . .

> (f) . . .

> The Parties shall work together to prepare a schedule of the Leases, which shall be attached hereto as <u>Exhibit A-1,</u> and a schedule of the Excluded Wellbores, which shall be attached hereto as <u>Exhibit B</u>, within ten (10) business days of the execution of this Agreement.

(PSA §§ 1.1(a), (f)).)  This provision in sum provides that the oil and gas leases to which the PSA is directed are depicted on Exhibit A that is attached to the PSA on the date of execution, August 29, 2012.  Those oil and gas leases were to be more particularly identified on Exhibit A-1, which the parties were to work together to prepare, along with a schedule of Excluded Wellbores as Exhibit B, within ten days of August 29, 2012.

The parties also included in Article 1 of the PSA a sub-section providing an option for Defendant Antero "to add additional Leases" from the same counties that contained the 4,159 acres.  (PSA § 1.3).  That provision is titled "Option to Add Additional Leases" and provides:

> Until the date that is six (6) months from the date of this Agreement, Buyer [*Antero*] *shall have the option, in Buyer's sole discretion,* to add additional Leases owned by Seller covering lands located in Noble, Monroe, and Guernsey Counties, Ohio, for $5,000 per net mineral acre and upon the terms and conditions of this Agreement.

> If Buyer exercises such election, the additional Leases shall be added to Exhibit A-1 of this Agreement upon exercise thereof and shall become subject to the terms and conditions of the Agreement.

*Id*.

In Article 2, titled "Purchase Price," the parties established the total purchase price for the 4,159 acres at "$20,795,000.00 (the <u>'Purchase Price'),</u> which is allocated among the Leases on the basis of $5,000 per 'Net Acre' (the <u>'Allocated Value')</u>."  (PSA § 2.1.)  This amount was

subject to outstanding title defects, allocated value effected by title defects, and allocated value effected by outstanding environmental defects. (PSA § 2.2.)

The PSA also contained the following Articles:  "Article 3 Buyer's Inspection," "Article 4 Title Matters," "Article 5 Environmental Matters," "Article 6 Seller's Representations and Warranties," "Article 7 Buyer's Representations and  Warranties," "Article 8 Covenants and Agreements," Article 9 Termination," "Article 10 Closing," "Article 11 Post-Closing Obligations," and "Article 12 Assumption and Retention of Obligations and Indemnification." The last Article, "Article 13 Miscellaneous," contains an integration clause and a forum selection clause.

**B.      Relevant Conduct of the Parties to the PSA**

On August 29, 2012, the parties signed the PSA.  The PSA required the parties, within ten days, to more particularly identify the leases depicted in green shading on the Exhibit A map that was attached to the PSA.  The more particularly identified leases were to be attached to the PSA and was referred to as Exhibit A-1.

On September 13, 2012, Plaintiff Stonebridge sent an email to Defendant Antero stating that Stonebridge was "working through [its] list of leases and will have our draft of Exhibit A-1 together by 5:00 pm."  (Antero App. Ex. 33, September 13, 2012); (Antero App. Ex. 7 Eddy Biehl Dep. Day 1, Deposition Ex. 11 at 88:23-89:23).  Later that same day, Plaintiff delivered a draft Exhibit A-1 ("Stonebridge A-1") to Antero that contained approximately 26,000 gross acres.

On September 14, 2012, Plaintiff emailed Antero noting that "[t]here are likely a number of duplicates in the schedule [Stonebridge A-1]" and his team "had almost no time to clean up this information."  (Antero App. Ex. 7, Eddy Biehl Dep. Day 1, at 73:3-15.)

The parties engaged in negotiations and on December 28, 2012, Antero acquired oil and gas leases of approximately 363 acres from Stonebridge for approximately $1.8 million.

The parties engaged in negotiations regarding the PSA for the next few months and have submitted a large amount of evidence related to this time period.  In February 2013, Defendant Antero sent to Stonebridge a proposed A-1 lease schedule that included some, but not all of the oil and gas leases listed on the Stonebridge A-1.  (Antero App. Ex. 4, Treml Dec. ¶ 9.)

On March 19, 2013, Defendant Antero sent a letter to Stonebridge terminating the PSA. In the letter Defendant indicated that it terminated the PSA because the parties had failed to agree on the schedule of leases for Exhibit A-1.  (Antero App. Ex. 7, Eddy Biehl Dep. Day 1, Deposition Ex. 31.)

## C.  Procedural Posture

On May 1, 2019, Stonebridge filed a breach of contract complaint in this Court.  Plaintiff alleged that because Antero failed to close on the approximate 26,000 acres listed on the Stonebridge A-1 it breached the PSA and it was "obligated to pay a minimum of $5,000 per mineral acre as listed on Exhibit A-1 for a total contract value of at least $131,381,050.00."  (*Id.* ¶ 58.)  Antero moved for judgment on the pleadings only with regard to the approximate 21,000 acres that was above the specified 4,159 acres in the PSA.  This Court granted Antero's motion, limiting the potential acreage to the 4,159 referred to in the PSA.  The Court explained that the PSA § 1.3 provides for the addition of acreage above the 4,159 at the "sole discretion" of Antero and that the election must be in writing.  The Court found that Antero made no such written election.

Defendant Antero filed a counterclaim asking for a declaration that the PSA is not a binding contract.  Antero asserted that because the parties were unable to more particularly

identify the leases on the anticipated Exhibit A-1, there was no mutual assent and no contract was formed.

Plaintiff Stonebridge moved for judgment on the pleadings on Defendant's counterclaim. This Court granted Plaintiff's motion, stating:

> Accordingly, in the instant action [because there are none] this Court need not resolve any factual disputes material to its determination of whether there was mutual assent to the creation of the PSA, which was indisputably negotiated and renegotiated, signed, and partially performed by two sophisticated parties.  The PSA unambiguously identified the execution date (August 29, 2012) the parties (Antero and Stonebridge), the subject matter (oil and gas leases in particular Ohio counties), the number of acres (4,159), the total cost amount to be exchanged (4,159 acres at $5,000 per acre for a total of $20,795,000), and an option for Antero to add more acreage.  Thus, the Court **GRANTS** Plaintiff's Motion for Judgment on the Pleadings on Antero's counterclaim asking for a declaration that the PSA is not a contract.
>
> Whether Antero breached the PSA by failing to include the approximately 1,398 acres that had allegedly been verified by Antero as of December 12, 2012, whether Antero's termination of the PSA was effective, the impact of the parties' inability to reach agreement on Exhibit A-1, or any other breach of contract disputes appropriately before the Court related to the 4,159 acres is left open.

*Stonebridge Operating Co., LLC v. Antero Resources Corp.*, 510 F. Supp. 3d 567, 578 (S.D. Ohio 2020).

The parties then engaged in discovery and have both moved for summary judgment. Those motions are fully briefed. (ECF No. 51, 54, 59, 67, 75, 82.)

## II.

### A.    Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence

of an element that is essential to that party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact."  *Id.* at 323.  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts").  Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

## B.    Analysis

As stated *supra*, this Court has determined that the PSA was an enforceable contract that potentially encompassed 4,159 acres at $5,000 per acre for a potential total of $20,795,000.00.  The parties partially performed under the PSA by closing on the approximately 364 acres for approximately $1.8 million.

Plaintiff contends that the evidence is uncontroverted that Antero breached the PSA because it terminated the PSA without purchasing the remaining leases or utilizing the PSA's title defect provisions to forego purchasing the remaining leases. Plaintiff maintains that Antero owes the full price of the remaining acreage. That is, 3,795 acres (4,159– 364) at $5,000 per acre for a total of $18,975,000. (Pl. Mot. for Summ. J. at 3, ECF No. 51.) Alternatively, Plaintiff asserts that it is entitled to specific performance of the PSA.

Defendant contends that it is entitled to summary judgment because (1) Antero was excused from further performance because a condition precedent to the remaining acreage becoming part of the PSA was not met; (2) Antero was excused from further performance because Plaintiff breached the PSA by failing to work together to agree on what specific oil and gas leases were associated with the 4,159 net mineral acres that Stonebridge would sell to Antero under the PSA and to identify those leases on Exhibit A-1; (3) Antero was excused from performance because Stonebridge's failure to work together with Antero to create Exhibit A-1 made Antero's performance impracticable; (4) Plaintiff cannot prove damages because the acreage was not identified on Exhibit A-1 and/or Stonebridge has submitted no evidence of the market value of the acreage or its efforts to mitigate its damages; and (5) Stonebridge is not entitled to specific performance, and even if it were entitled to specific performance Antero is excused from performing based upon the affirmative defense of laches.

The Court will address each of Defendant's arguments, which will encompass Plaintiff's arguments as well.

## 1. Condition Precedent

"Ohio law defines a condition precedent as 'one that is to be performed before the agreement becomes effective. It calls for the happening of some event, or the performance of

some act, . . . before the contract shall be binding on the parties.'" *Ramsey v. Penn Mutual Life Ins. Co.*, 787 F.3d 813, 822 (6th Cir. 2015) (quoting *Mumaw v. W. & S. Life Ins. Co.,* 97 Ohio St. 1 (1917) and citing *Ohio Nat'l Life Assurance Corp. v. Satterfield,* 194 Ohio App.3d 405 (2011)).

In the instant action, the Court's previously held that the PSA is a binding contract. Defendant, therefore, is not entitled to summary judgment based on non-performance of a condition precedent to contract formation.

Plaintiff too is not entitled to summary judgment because, while Defendants' argument related to the lack of agreement on Exhibit A-1 did not prevent the PSA from becoming a binding contract, it does support Antero's position that its continued performance of the PSA is excused based on Stanbridge's action/inaction or impracticability as discussed *infra*.

## 2. Excused from Performance Based on Plaintiff's Breach

Defendant Antero argues that it was excused from further performance of the PSA because Plaintiff breached the PSA. Specifically, Antero contends that Stonebridge failed to "work together" to agree on identifying the specific oil and gas leases that were associated with the 4,159 net mineral acres that Stonebridge would sell to Antero under the PSA and to identify those leases on Exhibit A-1.

Plaintiff Stonebridge disagrees, contending that "the parties did work together on Exhibit A-1 and Antero accepted the Stonebridge A-1." (Proposed Instruction, ECF No. 105.) Plaintiff posits:

> When Antero and its agents at Turner received Exhibit A-1 from the Plaintiffs, they didn't object. They didn't complain that Exhibit A-1 covered more than 4,159 acres. They didn't even ask Mr. Biehl [of Stonebridge] to specifically identify the 4,159 acres. The reason for that is simple. Antero negotiated for itself a provision in the PSA that would allow it to get its hands on everything it could get.

(Pl. Mem. in Opp. to Def. Mot. for Summ. J. at 11, ECF No. 75.)  Plaintiff therefore concludes that by Antero's silence, it assented to the Stonebridge A-1 constituting Exhibit A-1.

Plaintiff further argues that "Antero did not need anyone to tell it what the 4,159 acres were [because] Antero itself came up with that exact number, used it to create Exhibit A to the PSA, and put it in the PSA itself."  *Id*. at 6.  Plaintiff maintains that the information that would be included on Exhibit A-1 is "accessible through the ODNR [Ohio Department of Natural Resources] database [which] is substantial."  *Id*. at 7.  In other words, Antero had the information that would be particularly identified on Exhibit A-1 without any additional input from Stonebridge than it provided on Stonebridge A-1.

The Court finds that the impact of the parties' actions with regard to Exhibit A-1 presents disputed issues of material fact.  The PSA required the parties to "work together" to "more particularly" identify leases on Exhibit A and attach it to the PSA as Exhibit A-1.  It is for a jury to determine if the parties "worked together" to create an Exhibit A-1, whether the subsequent contract provisions were triggered if A-1 was agreed upon, and which party was at fault if no A-1 was agreed upon.  Accordingly, neither party is entitled to summary judgement based on this issue.

### 3.  Impracticability

Defendant Antero asserts that it is excused from performing the PSA because its performance became impracticable as a result of Plaintiff's conduct.  That is, Defendant is excused because of the failure of the parties to agree on an Exhibit A-1 schedule of the specific leases associated with approximately 4,159 net mineral acres that were to underlie the surface lands depicted in green shading on the Exhibit A map.  Plaintiff disagrees, arguing that Exhibit A-1 was agreed upon and that Defendant had all it needed to perform.

"'Impracticability' means that the contract could not be performed by the defendant, or could only be performed by the defendant with extreme and unreasonable difficulty, expense, or risk of injury. The mere fact that performance became more difficult or expensive than the defendant originally anticipated does not justify a finding that performance was impracticable." (1 CV Ohio Jury Instructions 501.17.) If all of the requirements for impracticability are proved, then Antero is excused from performing the PSA.

As discussed above, the Court finds genuine issues of material fact with regard to whether the PSA provision of working together to more particularly identify the leases on Exhibit A-1 was met.  Thus, it will be for the jury to determine whether Antero should be excused from performance under the PSA based on the affirmative defense of impracticability.

### 4.  Damages

Antero argues that it is entitled to summary judgment because Plaintiff fails to offer any evidence to support its damages, which is an element of its breach of contract claim.  Defendant posits that the exclusive measure of damages in this case "is the difference between the contract price and the market value of the property at the time of the breach."  (Def. Mot. for Summ. J. at 15–16, ECF No. 67) (citing *Roesch v. Bray*, 46 Ohio App.3d 49, 50 (6th Dist.1988); *Poppy v. Whitmore*, 8th Dist. Cuyahoga No. 84011, 2004-Ohio-4759, ¶ 10. Plaintiff agrees that this is the general rule of damages but contends that the law in Ohio does not dictate that it is the exclusive rule.  This Court agrees.

In Ohio, "even if the difference between the contract price and the market value of the property at the time of the breach was an appropriate method for determining appellee's expectation damages . . . it was not the exclusive measure of such damages, nor was it the exclusive remedy available to appellee."  *The Father's House International, Inc., v. Kurguz*,

2016-Ohio-5945,  E.3d 711 (10th Dist. 2016).  See also, *Anadarko E&P Co. LP v. Northwood Energy Corp.*, 2:12-CV-00938, 2015 WL 13748033 (S.D. Ohio July 24, 2015) (discussing damages available in a PSA dealing with oil and gas rights).  "The purpose of contract damages is to compensate the non-breaching party for the losses suffered as a result of a breach."  *Id*.

In the case *sub judice*, if the jury finds that Defendant breached the PSA, Plaintiff will have the opportunity to prove that it is entitled to damages in the amount sufficient to place it in the same position in which it would have been if the contract had been fully performed by Antero to the extent that the damages were reasonably certain and reasonably foreseeable.  *Ohio Jury Instructions*, Civil Instructions §§ 501.33.  Plaintiff will only be entitled to damages that were the natural and probable result of the breach of the PSA or that were reasonably within the contemplation of the parties as the probable result of the breach of the contract.  *Id*.

### 5.  Specific Performance and Laches

The equitable remedy of specific performance is available when the promisor's failure to perform constitutes a breach of the contract, and a remedy for the breach which is ordinarily available at law, such as money damages, will not afford the promisee adequate relief for a loss arising from the breach.  *Four Howards, Ltd. v. J & F Wenz Rd. Invest., L.L.C.*, 179 Ohio App. 3d 399, 412 (Ohio App. 6th Dist. 2008) (citing *Gehret v. Rismiller,* 2d Dist. No. 06CA1705, 2007-Ohio-1893, 2007 WL 1174464, ¶ 14).  "Specific performance of contracts rests within the discretion of the court, controlled by principles of equity, on full consideration of the circumstances of each particular case." *Midamco v. Sashko*, 2012-Ohio-1189, ¶ 25, 2012 WL 985903 (Ohio App. 8th Dist. 2012).  "[A]t the very least, in order to obtain specific performance of a contract, the party holding the option must show that he is willing, ready, and able to perform." *Four Howards, Ltd.*, 179 Ohio App. 3d at 412 (citations omitted).

Stonebridge claims it is willing, ready, and able to perform by tendering a generalized quitclaim deed to Antero because the PSA is "tailor-made for the quitclaim process."  (Pl. Mem. in Opp. to Def. Mot. for Summ. J. at 36, ECF No. 75.)

Antero argues, *inter ali*a, that Stonebridge is not ready and able to perform under the PSA.  Defendant explains that the PSA dictates how a conveyance of the subject leases would proceed, and it is not through a quitclaim deed.  The PSA mandates the form of the assignment of leases attached as Exhibit C to the PSA.  Allowing specific performance through a quitclaim deed therefore requires substituting the specific form of assignment the parties selected in the PSA.  Defendants' argument is well taken.

Accordingly, the Court concludes that specific performance is not an available remedy in this action.  Consequently, it is not necessary to address whether the affirmative defense of laches is available to Antero to excuse it from specific performance.

### III.

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion (ECF No. 67) and **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 51).  This case remains open.

**IT IS SO ORDERED.**

| | |
|---|---|
| <u>**July 1, 2022**</u> | *<u>/s/ Edmund A. Sargus, Jr.</u>* |
| **DATE** | **EDMUND A. SARGUS, JR.** |
| | **UNITED STATES DISTRICT JUDGE** |